IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                                                      Case No. 17-CR-2242-MV

LUCIANO GARCIA,

        Defendant.

## DEFENDANT'S REPLY TO THE UNITED STATES' RESPONSE TO MOTION TO REDUCE SENTENCE UNDER THE COMPASSIONATE RELEASE STATUTE 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Luciano Garcia, by and through his counsel of record, Assistant Federal Public Defender Emily P. Carey, replies to the United States' Response to Motion to Reduce Sentence Under the Compassionate Release Statute 18 U.S.C. § 3582(c)(1)(A)(i) (Response)(Doc.148). First, the United States claims that the Court lacks jurisdiction to address Mr. Garcia's motion because he did not exhaust his administrative remedies. The United States concurs that Mr. Garcia's underlying health conditions, which place him at increased risk of severe illness or death from COVID-19, constitute "extraordinary and compelling" reasons to consider a sentence reduction under the First Step Act. However, the United States contends that compassionate release is not merited under the 18 U.S.C. § 3553 factors. Since Mr. Garcia filed his Motion, the number of coronavirus cases at FCI Beaumont Low has grown tremendously. With now more than 476 incarcerated individuals who have tested positive for COVID-19, FCI Beaumont Low has the third highest rate of coronavirus

1

infections of all BOP facilities and residential reentry centers.[1] Accordingly, Mr. Garcia requests <u>expedited treatment</u> of his motion.

**I.     Mr. Garcia Has Satisfied the 30-Day Statutory Exhaustion Requirement**

Title 18, United States Code, Section 3582(c)(1)(A) permits an incarcerated individual to bring a compassionate release motion in a district court after satisfying one of two statutory methods of exhaustion: (1) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "*the lapse of 30 days from the receipt of such a request by the warden* of the defendant's facility, *whichever is earlier*[.]" (emphasis added). Despite unambiguous statutory language, the United States contends that this Court lacks authority to review Mr. Garcia's Motion at present because he has not exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A) by appealing the Warden's June 30, 2020 denial of his compassionate release request. (*See* Response at 8-15).

As a preliminary matter, contrary to the United States' contention, the Warden's response is not timely. The Warden's response is dated June 30, 2020 – which is more than thirty days from receipt of Mr. Garcia's request. (*See* Exhibit 1 to Response). More critically, Mr. Garcia emphatically reports that he never received a copy of this letter or anything else signed by the Warden. Undersigned counsel only learned of the Warden's response on July 17, 2020, from Assistant United States Attorney Paul Mysliwiec who then provided counsel with a copy. At that time, undersigned counsel also learned from AUSA Mysliwiec of a June 15, 2020 letter from the Warden addressed to her that she also never received. This letter dated June 15, 2020, arrived by mail late on July 17, 2020. It was postmarked July 13, 2020 – nearly one month after the date indicated on the letter. (*See* Exhibit D, Letter Received from BOP). Mr. Garcia certainly cannot be expected to appeal a decision he never

---

[1] Bureau of Prisons, COVID-19 Update, available at: https://www.bop.gov/coronavirus/ (last viewed on July 24, 2020).

received, and more than 30 days elapsed since he submitted his request for compassionate release to the Warden.

Moreover, even assuming for purposes of argument that Mr. Garcia had received the Warden's denial in a timely manner, this Court would still have authority to hear Mr. Garcia's Motion. The statute means what it says: thirty days is thirty days. Many courts have interpreted the language in the 30-day lapse provision to require only that 30 days have passed after the inmate's request for relief to the Warden, with no need for the inmate to appeal the Warden's denial even if received within 30 days.[2] In fact, in *United States v. Woodson,* 1:13-cr-20180-CMA, Doc. 402 at 5-6 (S.D. Fla. June 5, 2020), the United States articulated the Department of Justice and the Bureau of Prisons position:

> If Congress had intended that an inmate go through all stages of the BOP appeal before judicial review, it would not have created any exception to the administrative exhaustion requirement. Instead, Congress's inclusion of a 30-day lapse provision not only creates an exception to plenary BOP exhaustion, it also functions as an accelerant to judicial review…In other words, under the statutory framework, 30 days is the ceiling on how long the BOP process may take and the maximum duration an inmate has to wait before getting judicial review. This is in keeping with Congressional intent of 'expedit[ing] compassionate release applications' through the exhaustion framework of the First Step Act. *See* 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018). 'The 30-day lapse provision ensures that requests for sentencing modifications are timely addressed by the Court. If a Warden's response renders the 30-day lapse provision inoperative, a Warden's timely denial could cause a defendant to wait months before filing his or her motion.' *United States v. Hardin,* No. 19-cr-240, 2020 U.S. Dist. LEXIS 90855 at *4 (N.D. Ohio May 21, 2020). Indeed, '[t]his delay is the very thing the 30-day lapse provision is seemingly meant to avoid,' which is why a district should be able to consider a defendant's motion after the lapse of 30 days from the warden's receipt of a defendant's request.

---

[2] *See, e.g., United States v. Laureti,* No. 16-60340-CR-Bloom, 2019 WL 7461687 at *1 (S.D. Fla. Dec. 17, 2019); *United States v. Somerville,* No. 2:12-CR-225-NR, 2020 WL 2781585 at *4-5 (W.D. Pa. May 29, 2020); *United States v. Hardin*, No. 19-CR-240, 2020 WL 2610736, at *2 (N.D. Ohio May 22, 2020); *United States v. Haney*, No. 19-CR-541, 2020 U.S. Dist. LEXIS 63971, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020); *United States v. Jenkins*, 99-cr-00439, 2020 WL 2466911, at *4 (D. Colo. May 8, 2020); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *4 (E.D. Mich. May 7, 2020); *United States v. Ardila*, No. 3:03-cr-264, 2020 WL 2097736, at *1 (D. Conn. May 1, 2020); *United States v. Robinson*, 18-cr-00597, 2020 WL 1982872, at *2 (N.D. Cal. Apr. 27, 2020); *United States v. Spears*, 3:98-cr-0208, 2019 WL 5190877, at *1, *3 (D. Or. Oct. 15, 2019); but *cf. United States v. Peuser,* No. 8:17-cr-60, 2020 WL 2732088 at *1 (D. Neb. May 26, 2020) (concluding that where the warden denied the inmate's request within 30 days, the defendant must then administratively appeal the denial before filing a motion in the district court); *United States v. Alejo,* No. CR 313-009-2, 2020 WL 969673 (S.D. Ga. Feb. 27, 2020) (same).

In short, the Court should "decline to read additional requirements into the statute that aren't there." *Somerville,* 2020 WL 2781585 at *4-5; *see also Hardin,* 2020 WL 2610736 at *2 ("The language of § 3582(c)(1)(A) does not specify that the 30-day lapse provision applies only if the Warden fails to respond."). Mr. Garcia submitted his request for compassionate release to the Warden on May 29, 2020. He advises that he never received a response from the Warden and well over 30-days lapsed between his request and his Motion to the Court. However, even assuming for purposes of argument that Mr. Garcia had received the Warden's denial within thirty days of his request, the statute does not require him to wade through multiple levels of appeals before being able to seek relief from the Court. The Court has authority to address Mr. Garcia's Motion now.

## II.     The Bureau of Prisons is Not Successfully Managing the COVID-19 Outbreak

In its Response, the United States suggests that the Bureau of Prisons, through the existence of its COVID-19 Action Plan, has everything under control. (*See* Response at 3-6). But, "[t]he road to hell is paved with good intentions," and while BOP might have expressed a commitment to mitigating the spread of the coronavirus, it acted too late. For example, BOP did not provide masks to correctional officers or inmates until after numerous inmates were quarantined, and often after inmates had died.[3] As explained in Forbes:

> Under that plan, the BOP has Six Stages of response from Preparation to Recovery. By the time there was human-to-human transmission in the U.S., the BOP was, according to its plan, at Stage Four, one stage short of total pandemic outbreak across the United States. The measures include "social distancing," something most of us did not know as an official term until this year. During this Phase Four, BOP instead continued to grant unrestricted facility access to thousands of visitors for another six (6) weeks, and otherwise failed to timely or consistently implement the detailed mitigation and containment protocols mandated by its own plan. Visitation and legal visits were not suspended until March 13, 2020, subjecting inmates, their families, attorneys and BOP staff to possible exposure of the deadly virus.[4]

---

[3] *See* Walter Pavlo, *Bureau of Prisons Had a Response Plan for a Pandemic But Delayed Action,* Forbes (Apr. 23, 2020), available at: https://www.forbes.com/sites/walterpavlo/2020/04/23/bureau-of-prisons-had-a-response-plan-for-a-pandemic-but-delayed-action/#473e84be3d97 (last viewed on July 22, 2020).
[4] *See id.*

4

Relying on an outdated March 26, 2020 statement from the BOP Director and an incomplete view of statistics, the United States seems to claim that the rate of infection among incarcerated individuals in BOP custody is low. (*See* Response at 5). This is simply untrue. BOP reports that there are approximately 142,708 individuals under it care and control.[5] According to BOP's own reporting, as of July 22, 2020 approximately 9,905 inmates in their care have contracted COVID-19.[6] Even assuming significant underreporting, that is an infection rate of 6.94%. Also as of July 22, 2020, Bernalillo County reports 4,005 positive coronavirus tests in Bernalillo County, New Mexico.[7] With a population of approximately 679,121, that is an infection rate of .590% of the population. In other words, the rate of infection in BOP facilities is nearly 12 times higher than that of the general population in Bernalillo County. Moreover, FCI Beaumont Low reports an overall population of 1,441 inmates. As of July 22, 2020, the number of inmates at the facility who have tested positive is 476. That means approximately 33% of the population - that we know of - has been infected with the coronavirus. The outbreak is at Beaumont is so significant that it has been the subject of national news articles, and family members of individuals incarcerated there planned to protest conditions at the facility.[8]

Contrary to the United States' assertion, incarcerated individuals at FCI Beaumont Low who have tested positive for coronavirus have not been "isolated from fellow inmates." (Response at 5). Mr. Garcia reports that individuals who have tested positive are still living in close quarters. This is

---

[5] *See* Bureau of Prisons, COVID-19 Update, available at: https://www.bop.gov/coronavirus/ (last viewed on July 22, 2020).
[6] *See id.*
[7] *See* New Mexico Department of Health, COVID-19 in NM, available at: https://cvprovider.nmhealth.org/public-dashboard.html (last viewed on July 22, 2020).
[8] *See* Katherine Fung, *America's 3 Largest Coronavirus Prison Outbreaks, Located in Texas, Have Infected Over 2,100*, Newsweek (July 21, 2020), available at: https://www.newsweek.com/americas-3-largest-coronavirus-prison-outbreaks-located-texas-have-infected-over-2100-inmates-1519440 (last viewed on July 22, 2020); Julia De Angelo, *Texas now home to three worst federal prison coronavirus outbreaks*, MSNBC (July 22, 2020), available at: https://www.msnbc.com/rachel-maddow-show/texas-now-home-three-worst-federal-prison-coronavirus-outbreaks-n1234652 (last viewed on July 22, 2020).

consistent with reports from other inmates in the facility.[9] Even in the best of times, the Bureau of Prisons has struggled to provide adequate medical care.[10] Given the percentage of the population at FCI Beaumont Low infected with the coronavirus it seems unfathomable that BOP is prepared to provide the level of care necessary to address this crisis.

    **III.**     **Mr. Garcia's Underlying Health Conditions, Which Place Him at High Risk of Severe Illness or Death from the Coronavirus, Present an Extraordinary and Compelling Reason for a Sentence Reduction**

The United States concedes that Mr. Garcia's underlying health conditions, which put him at "increased risk of severe outcomes from COVID-19, collectively constitute 'extraordinary and compelling reasons' to consider sentence reduction at a generalized level." (*See* Response at 17). This is consistent with May 18, 2020 Department of Justice guidance to prosecutors. Yet, then the United States contends, based on language in a Fifth Circuit case, that Mr. Garcia's circumstances "are not sufficiently rare or extraordinary" to merit compassionate release, and that his arguments overlook the BOP's ability to treat infectious disease. (Response at 18-19). "Rare and extraordinary" is not the standard. The relevant portion of the statute, 18 U.S.C. § 3582(c)(1)(A), allows for sentence reduction when "extraordinary and compelling reasons warrant such a reduction." As discussed more fully in Mr. Garcia's Motion, Congress never defined "extraordinary and compelling reasons." Nor does the applicable guideline itself, U.S.S.G. § 1B1.13, which merely repeats the statutory language. However, Application Note 1 to the guideline sets out four examples of extraordinary and compelling reasons, to include a catchall for "other compelling and extraordinary reasons as determined by the director of

---

[9] *See, e.g.,* Angel San Juan, *Inmates' Relatives Plan to Protest Conditions at Beaumont Federal Prison*, KTXS12 ABC News (July 19, 2020), available at: https://ktxs.com/news/local/inmates-relatives-plan-to-protest-conditions-at-beaumont-federal-prison (last viewed on July 23, 2020).

[10] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016) (finding the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions).

BOP." With the First Step Act, Congress' intent was for courts to be able to determine what other matters constitute "compelling and extraordinary reasons" under the catchall provision.

In this case, Mr. Garcia has presented extraordinary and compelling reasons for a reduction in sentence. The United States cites to a case in which the court declined to reduce a sentence based on "generalized COVID-19 fears and speculation," and to another where the Third Circuit invited the appellant to renew his emergency motion for release were he to be diagnosed with COVID-19. (*See* Response at 20). Mr. Garcia's fears are far from speculative, and he has not "overlook[ed] the BOP's ability to treat infectious disease." (*See* Response at 19). As discussed above, BOP has failed to appropriately manage the spread and treatment of coronavirus in its facilities – with FCI Beaumont Low representing one of the worst outbreaks in the country. As a result, Mr. Garcia now has coronavirus, a terrifying prospect giving his serious underlying health issues. In *United States v. Vasquez Torres,* 1:19-cr-20342-BB (S.D. Fla. July 10, 2020), the court rejected the government's contention that BOP was capable of caring for its inmates when, shortly after sentencing, the defendant was infected with COVID-19.

Mr. Garcia agrees that as of right now, his COVID-19 symptoms have been somewhat mild and akin to a serious flu. Nevertheless, the danger Mr. Garcia faces is as present as it ever was. On July 17, 2020, the CDC revised its list of health conditions that place individuals at increased risk of severe illness from COVID-19. That list still includes obesity (defined as BMI of 30 or higher), heart failure, and hypertension – all conditions Mr. Garcia has suffered from chronically for years.[11] Medical records previously provided to this Court also reflect a history of dyspnea and regular

---

[11] *See* Centers for Disease Control and Prevention, Coronavirus Disease 2019, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last viewed on July 22, 2020).

hospitalizations. There are countless examples of individuals who initially exhibited mild symptoms that then drastically worsened.[12]

Evidence is now showing that individuals who remain asymptomatic or with mild symptoms can suffer severe and potentially lasting consequences from COVID-19. In one study, cardiac ventricular abnormalities were observed in 55% of all COVID-19 patients undergoing echocardiography, with one in seven abnormalities being severe.[13] Long lasting lung damage can also occur. A June 18, 2020 medical study reported that 57% of asymptomatic participants showed lung abnormalities.[14] According to a doctor at Johns Hopkins University, this is particularly true when "there are existing health problems such as…heart disease that can raise the risk of severe disease."[15] In prison, there is no mechanism for treating individuals with mild symptoms to try to reduce permanent damage from COVID-19. As such, Mr. Garcia's already weak circulation and respiratory systems have likely been negatively effected. Granting him compassionate release under appropriate conditions so that he may seek proper treatment from his local providers could markedly improve his chances of recovery.

Compassionate release could also help Mr. Garcia avoid possible reinfection in the future. A new study found that "coronavirus antibodies dwindled to undetectable levels after just two or three

---

[12] *See, e.g.,* Shira Feder, *Coronavirus symptoms might get better before they get worse, and the downturn can happy very quickly, doctors say,* Business Insider (Apr. 15, 2020), available at: https://www.businessinsider.com/coronavirus-symptoms-start-slow-and-worsen-quickly-doctors-say-2020-3 (last viewed on July 23, 2020); Erick Edwards, *'A slow burn'; Coronavirus symptoms often linger before worsening*, NBC News (Mar. 21, 2020), available at: https://www.nbcnews.com/health/health-news/slow-burn-coronavirus-symptoms-often-linger-worsening-n1164756 (last viewed on July 23, 2020).

[13] *See* Marc Dweck, et al., *Global evaluation of echocardiography in patients with COVID-19,* European Heart Journal (June 2, 2020).

[14] *See* Quan-Xin Long, et al., *Clinical and immunological assessment of asymptomatic SARS-CoV-2 infections*, Nature Medicine (June 18, 2020).

[15] *See* Panagis Galiatsatos, M.D., *What Coronavirus Does to the Lungs* (April 13, 2020), available at: https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs (last viewed on July 22, 2020).

8

months for 40% of asymptomatic people and 13% of symptomatic people."[16] The MIT Technology Review also reported on a different study that found antibody levels drop rapidly after a coronavirus infection.[17] The medical director of immunopathology at the Cleveland Clinic stated that the question of what happens when people are re-exposed to the coronavirus is a critical question. He said that if protection against COVID-19 tends to be short-lived, it would make masking and social distancing even more important. He continued, "In the absence of a vaccine, the main thing we'd have against reinfection are these protective measures."[18]

These protective measures simply are not available to Mr. Garcia in BOP custody where inmates are not properly quarantined and where they remain in high population pods rendering social distancing impossible. This is extremely concerning to Mr. Garcia who is still at risk of worsening symptoms. Given scientific evidence demonstrating damage even to those with mild symptoms, Mr. Garcia fears he would not survive a second round of virus because of his already compromised health. Numerous courts have found that inmates are not safer in prison.[19] Numerous courts have also granted compassionate release to individuals who have contracted COVID-19 on grounds of superior medical

---

[16] *See* Morgan McFall-Johnsen, *Coronavirus antibodies may disappear 2 to 3 months after people recover, a new study found,* Business Insider (June 18, 2020), available at: https://www.businessinsider.com/coronavirus-antibodies-only-last-months-weaker-in-asymptomatic-cases-2020-6 (last viewed on July 23, 2020).

[17] *See* Charlotte Gee, *Immunity to COVID-19 Could Disappear in Months, a New Study Suggests,* MIT Tech. Rev. (July 13, 2020), available at: https://www.technologyreview.com/2020/07/13/1005103/immunity-to-covid-19-could-disappear-in-months-a-new-study-suggests/ (last viewed on July 23, 2020).

[18] Carolyn Y. Johnson & Ariana Eunjung Cha, *Can you get coronavirus twice? Doctors are unsure even as anecdotal reports mount.* The Washington Post (July 22, 2020), available at: https://www.washingtonpost.com/health/2020/07/22/can-you-get-coronavirus-twice/ (last viewed on July 23, 2020).

[19] *See, eg., United States v. Robinson*, Case No. 3:10-cr-261, ECF No. 86 at 10 (E.D. Va. July 17, 2020) (rejecting government's argument that inmates are safer in prison than in communities with ongoing spread and noting that "the BOP's [test] positivity rate of twenty-nine percent" shows that they are only testing the sickest inmates and that they are therefore likely dramatically undercounting the number of sick inmates in custody); *United States v. Powell*, No. 05-cr-61, ECF No. 78 at 9 (D.D.C. June 18, 2020) ("[I]t cannot seriously be disputed that an individual in prison is less able to control his own surroundings and exposure than he would be if living in single-family residence in the community."); *United States v. Esparza*, 2020 WL 1696084 (D. Idaho Apr. 7, 2020) (concluding based on review of unique transmission risks associated with correctional settings that "despite the best efforts of BOP officials, the likelihood of contracting the virus is greater in prison than if a defendant were able to fully self-isolated at home."); *Coreas v. Bounds*, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020) (characterizing the "claim that someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty" as "an absurdity").

care outside of custody and lack of clarity on whether one can become infected a second time from COVID-19.[20] Mr. Garcia's chronic underlying health conditions in light of the coronavirus pandemic, along with specific evidence that BOP and FCI Beaumont Low are incapable of caring for him and keeping him safe from serious illness or death, represent compelling and extraordinary circumstances meriting a reduction in sentence.

## IV. The Section 3553(a) Factors Support Compassionate Release for Mr. Garcia

The United States' primary reason for opposing Mr. Garcia's request is its claim that Mr. Garcia poses a danger to the community because of his criminal history and because he now has coronavirus. (*See* Response at 17). The burden rests with the defense to demonstrate by a preponderance of the evidence that Mr. Garcia is not a danger to the safety of any other person or the community as provided in 18 U.S.C. § 3142(g). *See United States v. Sprague,* 135 F.3d 1301, 1306-

---

[20] *See, e.g.*, *United States v. Fleming*, 2:17-cr-00362-AB (C.D. Cal. Jun. 24, 2020) (granting motion to COVID-positive defendant who BOP deemed recovered); *United States v. Davis*, 2020 WL 3443400 (E.D. Cal. Jun. 23, 2020) (granting motion over government argument that motion was moot because defendant had already contracted COVID-19); *United States v. Ramirez*, 14-cr-553-FMO (C.D. Cal. Jun. 19, 2020) (granting unopposed motion for defendant who had "recovered" from COVID-19); *United States v. Parramore*, 2020 WL 3051300 (W.D. Wash, Jun. 8. 2020) (granting compassionate release to COVID-positive defendant whose glaucoma was neglected in wake of coronaivrus); *United States v. McCall*, 2020 WL 2992197 (M.D. Ala. Jun. 4, 2020) (granting compassionate release to COVID-positive defendant with sickle-cell disease after evidentiary hearing); *United States v. Brown*, 2:18-cr-360, ECF 35 (N.D. Ala. May 22, 2020) (finding deteriorating medical condition after positive COVID-19 diagnosis and risk of inadequate medical care constituted "extraordinary and compelling" circumstances); *United States v. Alvarez-Tostado*, 98-cr-508-GW, ECF 691 (C.D. Cal. May 20, 2020) (granting compassionate release over government's argument that defendant's COVID-positive status rendered request moot); *United States v. Sholler*, 2020 WL 2512416 (N.D. Cal. May 15, 2020) (granting release to defendant who was determined to be "recovered" from COVID-19); *United States v. Arreola-Bretado,* 3:19-cr-3410, ECF 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Fischman*, 16-cr-00246-HSG-1, ECF 76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19-positive defendant); *United States v. Kriglstein*, 1:16-cr-00663-JCH-1, ECF 60 (D.N.M. Apr. 27,2020) (staying for 5 days release of defendant who was tested for COVID-19 as condition of order granting compassionate release, with positive result); *United States v. Huntley,* 13-cr-119-ABJ, ECF 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *Yeury J.S. v. Decker*, 2:20-cv-5071-KM, ECF 20 (D.N.J. May 11, 2020) (ordering release for COVID-19-positive immigration detainee).*United States v. Sholler*, No. 17-CR-00181-SI-1, 2020 WL 2512416, at *5 (N.D. Cal. May 15, 2020)("The parties agree that it remains unclear whether recovering from COVID-19 renders one immune from new infection.")

07 (9th Cir. 1998). Once the defendant has met his initial burden, the burden of proof shifts back to the United States on the ultimate issues. *Id.*

To be certain, Mr. Garcia is no saint. He has a long-standing addiction to heroin and methamphetamine. (PSR ¶¶ 81-82). Mr. Garcia's drug addictions have led to a series of arrests and convictions for crimes largely related to supporting his drug habit or committed while he was using. Mr. Garcia's most recent conviction prior to the instant offense was in 2012 for failing to appear in Metropolitan Court, which resulted in a $100.00 fine. Mr. Garcia recognizes that the offense at the center of this case is extremely serious. That, said, it is not a crime of violence and Mr. Garcia did not have any weapons or resist arrest in any way. He effectively acted as a go-between for the source of supply, or seller, and the buyer. (PSR ¶ 26). Mr. Garcia has never had any meaningful substance abuse or mental health treatment. He has been sober since his incarceration, and has had time to reflect on his past with some clarity. Correctional treatment provided while on supervised release, would have a powerful impact on Mr. Garcia's future conduct while also protecting him from serious illness or death.

Mr. Garcia would also like to call the Court's attention to actuarial data, which suggests he is at low risk of becoming a danger to the community. First, Mr. Garcia has a low risk PATTERN score. This is a score generated by BOP to determine an individual's risk of recidivism. The Warden indicated in the letter Mr. Garcia never received, that only those with a minimum PATTERN score receive priority treatment for transfer to home confinement. There has been widespread criticism of PATTERN, including claims that it amplifies racial disparities and that it should not be used to inform COVID-era decisions because it was not developed with the intent to inform those decisions.[21]

---

[21] Partnership on AI, *Algorithmic Risk Assessment and COVID-19: Why PATTERN Should Not Be Used* (Apr. 30, 3030), available at: https://www.partnershiponai.org/why-pattern-should-not-be-used-the-perils-of-using-algorithmic-risk-assessment-tools-during-covid-19/ (last viewed on July 20, 2020); *see also* Walter Pavlo, *Barr's Memo to Release Federal Inmates Fails to Address BOP Policies to Release Them*, Forbes (April 4, 2020), available at: https://www.forbes.com/sites/walterpavlo/2020/04/04/barrs-memo-to-release-federal-inmates-fails-to-address-bop-policies-to-release-them/#7e83d5a04ff3 (last viewed on July 20, 2020).

Nevertheless, BOP's own flawed system recognizes that Mr. Garcia is at *low risk* of recidivism. The Sentencing Commission has found that risk of recidivism reduces with age.[22] Individuals in the same criminal history category as Mr. Garcia and in the same age group recidivate at less than half the rate of much younger individuals (24.5% v. 54.7%).[23] Although recognizing that those suffering from substance abuse have a higher recidivism rate, the Commission also noted that, "[i]f, as the data indicate, abstinence from illicit drug use, or high school completion, reduced recidivism rates, then rehabilitation programs to reduce drug use or to earn high school diplomas may have high cost-benefit value."[24] Mr. Garcia has a high school diploma, and he has not used drugs since his incarceration. With proper community supports, such as substance abuse and mental health counseling, his risk of recidivism is very low.

As even the United States must admit, Mr. Garcia has not had any meaningful disciplinary issues while in BOP custody. According to information the United States provided, Mr. Garcia was apparently caught smoking a cigarette in an unauthorized area of the facility. This is the only issue he has had in over three years. There have been no threats, fights, or possession of weapons or other contraband. Rather, Mr. Garcia has been focused on maintaining his sobriety and improving himself as a person by taking advantage of educational opportunities.

Finally, the United States argues that Mr. Garcia would be safer in prison than in the community. This position is certainly not supported by the growing number of coronavirus cases throughout BOP facilities nationally, and specifically at FCI Beaumont Low as discussed above. This statement also contradicts the conclusion reached in a recent research letter in the Journal of the American Medical Association pertaining to coronavirus: "By June 6, 2020, there had been 42,107 cases of COVID-19

---

[22] *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* available at: https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines (last viewed on July 23, 2020).
[23] *See id.* at pg. 30.
[24] *See id.* at pg. 15.

and 510 deaths among 1,295,285 prisoners with a case rate of 3,251 per 100,000 prisoners. The COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate of 587 per 100,000. . . . COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the US population."[25]

When Mr. Garcia relayed his release plan to the Court, he had not yet been infected with COVID-19. Mr. Garcia's mother advises that it is possible for Mr. Garcia to quarantine at her home without any exposure to herself. Family members who are not at risk of severe illness from COVID-19 have advised that they can check on him regularly and bring him supplies. Mr. Garcia was previously insured by Medicaid and would undoubtedly qualify again. Providers with the Lovelace medical system in Albuquerque are familiar with Mr. Garcia's medical history and are appropriately equipped to handle any emerging COVID-19 related medical issues. Mr. Garcia's ex-wife and daughter have also been exploring community home health programs should the need for such services develop. To the extent that the Court might be concerned about Ms. Alderete's advanced age, Ms. Alderete has advised that she can stay with a close friend in Espanola leaving her home to her son to quarantine and recover until he produces a negative COVID-19 test. Mr. Garcia's adult daughter Dominique De Vargas reports that she will easily and safely be able to check in on Mr. Garcia, bring him food, and other care supplies. Alternatively, the family has also stated they could pay for an extended stay hotel in Albuquerque until Mr. Garcia recovers. Once recovered, Mr. Garcia could then return to his mother's home. At home in Albuquerque, Mr. Garcia would be able to quarantine and socially distance himself, reducing risk of worsening conditions or reinfection. He could have masks, hand sanitizer, and disinfectant wipes. He would have access to testing and

---

[25] Brendan Saloner, PhD, Kalind Parish, MA, Julie A.Ward, MN, RN, Grace DiLaura, JD, Sharon Dolovich, JD, PhD, *COVID-19 Cases and Deaths in Federal and State Prisons,* JAMA (July 8, 2020) available at: https://jamanetwork.com/

immediate medical treatment. In short, at home with appropriate conditions, Mr. Garcia would have a fighting chance to address his health conditions and keep himself as well as the community safe.

## CONCLUSION

The world in which this Court originally crafted what was then determined to be an appropriate sentence for Mr. Garcia has changed and the evaluation of medical care and treatment under 18 U.S.C. § 3553(a)(2)(D) is now dramatically different. Many courts have recognized that the pandemic has upended their original sentencing intentions. "When these men were sentenced, nobody could have predicted that a relatively brief term of imprisonment could be rendered a death sentence by an unprecedented pandemic." *United States v. Osorto,* 2020 WL 2323038 (N.D. Cal. May 11, 2020). For the foregoing reasons and those expressed in his initial Motion, Mr. Garcia respectfully requests that the Court grant his request for compassionate release and order him immediately released from BOP custody so that he may safely quarantine and recover in his mother's home, or alternative location as deemed appropriate by the Court, in Albuquerque, New Mexico.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

*Electronically filed July 27, 2020*
/s/ Emily P. Carey
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following: Paul Mysliwiec, Assistant United States Attorney.

*Electronically filed July 27, 2020*
/s/ Emily P. Carey
Assistant Federal Public Defender