IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                                              Case No. 17-CR-02242-MV

LUCIANO GARCIA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Luciano Garcia's Motion to Reduce Sentence Under the Compassionate Release Statute 18 U.S.C. § 3582(c)(1)(A)(i). Doc. 144. The government filed a response in opposition [Doc. 148] and Mr. Garcia filed a reply [Doc. 149]. Mr. Garcia also filed several appendices [Docs. 145 and 147] as well as an expert report [Doc. 151], each of which the Court has reviewed. Having considered the briefs, exhibits, relevant law, and being otherwise fully informed, the Court finds that Mr. Garcia's motion is well-taken and will be **GRANTED**. Exercising its authority to modify Mr. Garcia's sentence for extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A)(i), the Court will reduce his term of imprisonment to time served with six months of home detention to protect him from the significant risk that COVID-19 poses to his health in federal custody.

## BACKGROUND

This case began in August 2017, when Mr. Garcia was arrested after attempting to sell two pounds of methamphetamine to a confidential source with the Drug Enforcement Agency (DEA). Doc. 39 at ¶ 23. He later pled guilty to one count of Possession with Intent to Distribute 500 Grams

and More of a Mixture and Substance Containing Methamphetamine and Aiding and Abetting, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). *Id.* at ¶ 2. On February 2, 2018, visiting Judge Robert A. Junell sentenced Mr. Garcia to 135 months of imprisonment in the Bureau of Prisons (BOP) followed by five years of supervised release. Doc. 57 at 1–3. Due to Mr. Garcia's chronic health problems, Judge Junell recommended that he serve his time in a federal medical center. Doc. 144 at 2.

Mr. Garcia is 45 years old today and remains incarcerated at the Federal Correctional Institution Low in Beaumont, Texas (FCI Beaumont Low). Doc. 124 at 2. He has served approximately three and a half years of his 11-year sentence and has an expected release date of March 11, 2027. *Id.* at 2. On May 29, 2020, Mr. Garcia applied to the BOP for compassionate release due to his preexisting medical conditions and the threat posed by COVID-19. *See* Doc.148 Ex. 1. The warden of FCI Beaumont Low acknowledged the request on June 15, 2020 and then denied it on June 30 after finding that Mr. Garcia's "asserted medical conditions do not currently warrant an early release." *Id.* Mr. Garcia now moves the Court for compassionate release in light of his serious underlying health conditions, "including congestive heart failure, hypertension, hepatitis C, and obesity, each which put him at increased risk of death or serious illness from the coronavirus." *Id.* at 1. The government asks the Court to deny release because Mr. Garcia has failed to exhaust his administrative remedies; because his circumstances are not "sufficiently rare or extraordinary"; because Mr. Garcia's release is not supported by the factors set forth in 18 U.S.C. § 3553(a); and because his release would endanger the community. Doc. 148 at 8–22.

## STANDARD

Under 18 U.S.C. § 3582(c)(1)(A)(i), federal courts are permitted to reduce a defendant's term of imprisonment and/or modify their conditions of supervised release if, after a consideration

of the factors set forth in 18 U.S.C. § 3553(a), "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).  Prior to the passage of the First Step Act of 2018, only the director of the BOP could move for a reduction under the statute, leaving federal prisoners powerless to apply for compassionate release on their own behalf.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).  However, in a section of the Act titled "Increasing the Use and Transparency of Compassionate Release," Congress amended the law to allow defendants to move for sentence reductions under § 3582(c)(1)(A)(i) once they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  *Id.*

Since the passage of the First Step Act, courts have disagreed about what constitutes "extraordinary and compelling reasons" warranting relief.  Some courts continue to look to a policy statement from the United States Sentencing Commission listing several circumstances in which "extraordinary and compelling reasons" exist, including where the defendant is suffering from a terminal illness or a "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  *See, e.g., United States v. Willis*, 382 F. Supp. 3d 1185, 1187–88 (D.N.M. 2019) (applying USSG §1B1.13); *United States v. Gutierrez*, No. 05-CR-0217 RB, 2019 WL 1472320, at *2 (D.N.M. Apr. 3, 2019) (unreported) (same).  The policy statement also limits relief to those defendants who are "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  *See* USSG §1B1.13(2).

Other courts have held that because the policy statement in question predates the First Step Act and refers only to motions brought by the director of the BOP, it is no longer an "applicable

3

policy statement" that courts must consider under § 3582(c)(1)(A) and that limits the meaning of "extraordinary and compelling reasons" warranting relief. *See, e.g., United States v. Brown*, 411 F. Supp. 3d. 446, 449–51 (S.D. Iowa 2019) (listing cases). That position has recently been adopted by at least four federal circuit courts of appeals. *See United States v. Brooker*, 976 F.3d 228, 237 (2nd Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020); and *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). As a result, these circuits have held that until the Sentencing Commission promulgates a new policy statement, "district courts are empowered … to consider *any* extraordinary and compelling reasons for release that a defendant might raise." *McCoy*, 981 F.3d at 284 (quoting *Brooker*, 976 F.3d at 230) (internal quotations omitted) (emphasis in original). Although the Tenth Circuit has yet to definitively resolve this issue, it has continued to apply the policy statement in unpublished opinions analyzing motions under § 3582(c)(1)(A). *See United States v. Gieswein,* 832 Fed. Appx. 576 (Mem) (10th Cir. Jan. 5, 2021) (unpublished); *United States v. Saldana*, 2020 WL 1486892, at *2 (10th Cir. Mar. 26, 2020) (unpublished).

Despite their disagreements about the precise definition of "extraordinary and compelling reasons" justifying compassionate release, countless courts over the past year have agreed that such reasons exist in cases involving defendants whose serious underlying health conditions place them at an elevated risk of serious illness or death from COVID-19 while in custody. *See United States v. McCarthy*, No. 3:92-CR-0070 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020) (unreported) (listing cases releasing defendants with risk factors for COVID-19). Indeed, "[t]he number of courts agreeing that the COVID-19 pandemic constitutes an extraordinary and compelling reason for release still grows by the day." *United States v. Ledezma-Rodriguez*, No. 3:00-CR-00071, 2020 WL 3971517, at *6 (S.D. Iowa Jul. 14, 2020) (unpublished) (citing 23 cases

from 16 federal districts across the country).

## DISCUSSION

The Court has now considered the parties' well-reasoned arguments and the relevant legal authority, including 18 U.S.C. § 3582(c)(1)(A)(i), the Sentencing Commission's guidance in U.S.S.G. §1B1.13, and the factors set forth in 18 U.S.C. § 3553(a). It has also reviewed the medical records from Mr. Garcia's numerous hospitalizations in the three years leading up to his arrest and the expert report recently completed by Dr. George Bren, a cardiologist with board certification in Internal Medicine and Cardiovascular Disease retained by the defense. Doc. 145 at Ex. C; Doc. 151. For the reasons explained below, the Court finds that Mr. Garcia has satisfied § 3582(c)(1)(A)'s exhaustion requirement; that his serious preexisting conditions, most notably his history of congestive heart failure, give rise to "extraordinary and compelling reasons" warranting his compassionate release because they put him at a significantly increased risk of severe illness or death from COVID-19 while in custody; that the § 3553(a) factors support Mr. Garcia's early release; and that his release would not endanger the community. Releasing Mr. Garcia so early into his sentence is not a decision the Court takes lightly, and it is not one that the Court would ordinarily make. These are not ordinary times, however, and traditional interests like finality, retribution, and deterrence must be balanced against the need to protect medically vulnerable inmates like Mr. Garcia from the COVID-19 pandemic, a grave and continuing risk that was never intended as part of his punishment in this case and that the BOP, despite its best efforts and intentions, can only do so much to mitigate. The Court will accordingly reduce Mr. Garcia's sentence to time served and allow him to begin serving his five-year term of supervised release at his daughter's home in New Mexico, where he will start by serving six months of home detention.

**I.      Section 3582(c)(1)(A)'s Exhaustion Requirement**

The government first argues that Mr. Garcia has failed to satisfy the exhaustion requirement in § 3582(c)(1)(A) because the warden of FCI Beaumont Low responded to his request for compassionate release in a timely manner and Mr. Garcia failed to pursue all available appeals of the warden's denial within the BOP. Doc. 148 at 8. In response, Mr. Garcia argues that the warden's denial was *not* timely because it was signed more than 30 days after he submitted his administrative request and that, in any event, § 3582(c)(1)(A) does not require him to pursue all administrative appeals within the BOP before filing a motion for compassionate release in federal court. Doc. 149 at 2–4.

Although there are plausible arguments on both sides, the Court agrees with Mr. Garcia's interpretation of § 3582(c)(1)(A). The relevant language in that section allows defendants to move for compassionate release in federal court once they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." § 3582(c)(1)(A) (emphasis added). First, as Mr. Garcia points out, the 33 days it took the warden of FCI Beaumont Low to deny his administrative request for compassionate release (the warden denied the request on June 30, 2020 after receiving it on May 29, 2020) means that more than 30 days had lapsed from "the receipt of [Mr. Garcia's] request by the warden of [his] facility" to the date of the warden's denial. *See* Doc. 149 at 2.

Second, the Court believes that the plain language § 3582(c)(1)(A)'s lapse provision would have allowed Mr. Garcia to apply to this Court for compassionate release 30 days after submitting his administrative request to the BOP even if the warden's denial had been timely. As Judge Jed Rakoff on the United States District Court for the Southern District of New York recently

6

explained, "[T]he statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *United States v. Haney*, 454 F. Supp. 3d. 316, 321 (S.D.N.Y. 2020) (emphasis in original). The alternative reading of the statute—that a defendant cannot bring a compassionate release motion in district court as long as they have administrative appeals left to pursue and the warden of their BOP facility initially denied their request within 30 days—would mean that the BOP has the power to delay a district court's consideration of a defendant's request for compassionate release indefinitely while it processes the defendant's administrative appeals under no statutory time constraint. The Court does not believe that reading is consistent with the plain text of the statute or Congress's intent when it amended § 3582(c)(1)(A) in the section of the First Step Act of 2018 entitled "Increasing the Use and Transparency of Compassionate Release." *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018). As the United States District Court for the Southern District of West Virginia has explained, "[a]n unlimited timeframe for the administrative exhaustion process frustrates the purpose of the statute. Why include the 30 day wait period if its only function is to prompt the warden to respond faster but does not restrict the overall timeframe of an appeal to the BOP?" *United States v. Carter*, 469 F. Supp. 3d 583, (S.D.W. Va. 2020).

So far, the only federal appellate court to directly consider this issue has agreed that an inmate need only wait 30 days after the warden receives his administrative request to file his motion for compassionate release in federal court, regardless of whether the warden timely responded. *See United States v. Harris*, 973 F.3d 170, 171 (3rd Cir. 2020). Notably, in that case, the government conceded that the district court was wrong to adopt the stricter reading of

§ 3582(c)(1)(A)'s exhaustion requirement. *See id*. And while the Tenth Circuit has not squarely addressed this issue, its discussion of the lapse provision in a recent unpublished decision suggests that it would likely be sympathetic to the straightforward reading Mr. Garcia advances. *See United States v. Springer*, 820 Fed. Appx. 788, 791 (10th Cir. July 15, 2020) (unpublished) (stating that the exhaustion requirement is satisfied if an inmate has requested that the BOP move for compassionate release on their behalf and "thirty days have passed since the 'warden of the [inmate]'s facility' received a compassionate-release request from the inmate").

Here, because the warden of Mr. Garcia's federal prison failed to decide his request for compassionate release within 30 days and because more than 30 days have lapsed since the warden received his request, Mr. Garcia has satisfied § 3582(c)(1)(A)'s exhaustion requirement and his motion is ready for consideration on the merits.

## II.     Extraordinary and Compelling Reasons for Release

On the merits, Mr. Garcia argues that his "chronic underlying health conditions in light of the coronavirus pandemic, along with specific evidence that BOP and FCI Beaumont Low are incapable of caring for him and keeping him safe from serious illness or death, represent compelling and extraordinary circumstances meriting a reduction in sentence." Doc. 149 at 10. The Court agrees. The evidence in the record of Mr. Garcia's serious underlying health conditions is extensive. Mr. Garcia's BOP medical records list over 14 identified health problems, including chronic viral hepatitis C, sleep apnea, essential hypertension, an enlarged prostate, a Body Mass Index (BMI) over 34, and heart disease. Doc. 145 Ex. 2 at 5–7. To provide more detail on these conditions, the defense submitted an expert report this month by Dr. George Bren, a general cardiologist with board certification in Internal Medicine and Cardiovascular Disease. Doc 151 Ex. 1. Dr. Bren's report is based on his review of Mr. Garcia's medical records from November

2015 to November 2020, including hospital records from Lovelace Hospital in New Mexico and Mr. Garcia's medical records from the BOP. *Id.* at 1.

On Mr. Garcia's heart disease, Dr. Bren writes that he suffers from heart disease with cardiomyopathy and congestive heart failure, a condition first diagnosed in June 2016 after Mr. Garcia was hospitalized with "respiratory failure requiring mechanical ventilatory support." *Id.* An echocardiogram (EKG) performed at the time showed "severe left ventricular dysfunction" and an ejection fraction ("the percentage of blood contained by the heart that is ejected with each heartbeat") of 30%, far under the normal range of 50–75%. *Id.* Dr. Bren notes that Mr. Garcia subsequently returned to the hospital four times in 2016 and 2017 due to his congestive heart failure [*id.*], an observation supported by the statement in Mr. Garcia's Presentence Investigation Report (PSR) that the mother of four of his children, Bernadette DeVargas, "recalled taking him to the hospital at least five times since he was diagnosed with congestive heart failure due to him becoming ill and having trouble breathing" [Doc. 39 at ¶ 77]. Although a follow-up EKG in November 2016 returned normal results, additional EKGs in April and May 2017 continued to show abnormally low ejection fractions, with the April test also showing "mild to moderate mitral regurgitation, abnormal diastolic function … cardiac enlargement and pulmonary hypertension," the last of which indicates "significant" congestive heart failure. Doc. 151 Ex. 1 at 1–2.

Dr. Bren additionally notes that Mr. Garcia suffers from obesity, with a BMI of 34.8; obstructive sleep apnea that he believes is "likely severe" due to "persistent findings of elevated red blood cell count"; hepatitis C that appears to have cleared beginning in late 2018; and ongoing hypertension that has persisted "despite current therapy," as demonstrated by a November 2020 blood pressure reading of 176/113 (the normal blood pressure range is 130 or lower/80 or lower). *Id.* at 2. Dr. Bren further notes that Mr. Garcia smoked tobacco heavily for 25 years prior to his

arrest in this case and also used heroin and methamphetamine "his entire adult life." *Id*. at 2–3. Finally, Dr. Bren notes that Mr. Garcia contracted COVID-19 this July while in BOP custody. *Id*. at 3. Although that infection was mild, with Mr. Garcia experiencing symptoms "akin to a serious flu" [Doc. 149 at 7], Dr. Bren states that "there have recently been multiple reported cases of documented [COVID-19] reinfection" and that while there is a general belief that COVID-19 infection confers some level of immunity, "the duration of purported immunity is unknown." Doc. 151 Ex. 1 at 3.

Of great importance to the instant motion, Dr. Bren's report also explains that several of Mr. Garcia's preexisting conditions would place him at a significantly elevated risk of severe illness or death were he to become reinfected with COVID-19. Dr. Bren writes, for example, that the Centers for Disease Control (CDC) has designated heart disease with cardiomyopathy and congestive heart failure as a "Tier 1" condition proven to increase the risk of severe illness or death from COVID-19. *Id*. This designation is supported by a "meta-analysis of 13 previously published studies" that found that the presence of these heart conditions "increases the risk of severe or fatal disease 5.19-fold." *Id*. Obesity is likewise a Tier-1 condition, and a review of 14 published studies found that individuals with BMIs considered "overweight" have a risk of mortality from COVID-19 that is 3.68 times higher than those with normal BMIs. *Id*. Individuals with "overweight" BMIs were also found to be 6.98 times more likely to require ventilatory support than those with normal BMIs. *Id*. Dr. Bren also notes that recent studies have found the risk of severe or fatal COVID-19 to be between 2.51 and 2.95 times more likely in former smokers such as Mr. Garcia. *Id*. at 3–4. Finally, Dr. Bren notes that while the research is still evolving, Mr. Garcia's uncontrolled hypertension puts him at an undisputedly higher risk for severe COVID-19 illness and that obstructive sleep apnea has also been associated with a significantly higher risk of severe

disease, by a factor of as much as 5.24 in one study. *Id*. at 4. The CDC has also found that individuals like Mr. Garcia with two or more high-risk conditions face a risk of mortality from the virus that is 4.5 times higher than the risk encountered by individuals with similar demographics but who do not suffer from a high-risk condition. *Id*.

Dr. Bren's report additionally explains that Mr. Garcia's risk of severe illness or death from COVID-19 is further elevated by the fact that "federal inmates in general have a higher rate of [COVID-19] infection than the general population," a reality he attributes to a variety of factors including the inability of people in prison to socially distance, the decreased availability of personal protective equipment, and inmate turnover. *Id*. Dr. Bren notes that as of January 8, 2021, 6,176 federal inmates were actively infected with COVID-19; 35,647 had recovered from the virus; and 183 had died from it. *Id*. at 5. Based on those numbers, Dr. Bren approximates that 35.5% of the federal prison population has contracted COVID-19, a rate significantly higher than the documented infection rate of 6.6% for the general United States population. *Id*. Dr. Bren then concludes by rendering two overall expert opinions: (1) "There is a significantly higher rate of infection with [COVID-19] amongst federal inmates as compared to the general U.S. population"; and (2) "Mr. Garcia is at significantly increased risk of developing severe or fatal COVID-19 disease on the basis of his heart disease, obesity, smoking history, hypertension and possibly sleep apnea." *Id*. The government has not filed any objections to Dr. Bren's report or his ultimate conclusions.

On the whole, the evidence of Mr. Garcia's risk of serious illness or death from COVID-19 is as comprehensive as it is alarming, and it gives rise to "extraordinary and compelling reasons" warranting his compassionate release under any definition of the term. The Court is persuaded by the reasoning of the Second, Third, Fourth, and Seventh Circuits in finding that U.S.S.G. §1B1.13

is no longer an "applicable policy statement" that the Court must apply when considering a motion for compassionate release under § 3582(c)(1)(A)(i). As Judge Easterbrook aptly explained, §1B1.13, by its own language, is only applicable to motions filed by the "Director of the Bureau of Prisons" and not by inmates moving for compassionate release on their own under the First Step Act. *See Gunn*, 980 F.3d at 1180 (quoting §1B1.13 and the accompanying Application Notes). Under a plain reading of § 3582(c)(1)(A)(i), the current circumstances are "extraordinary and compelling." *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 394 (E.D. Pa. 2020) (interpreting the plain meaning of the statute and finding that for a defendant with high blood pressure, diabetes, and liver abnormalities, "nothing could be more extraordinary and compelling than this pandemic."). Even if §1B1.13 still applies, however, Mr. Garcia's release would be consistent with it because his chronic medical problems constitute "serious physical or medical condition[s]" from which he is not expected to recover and which substantially diminish his ability to "provide self-care within the environment of a correctional facility" because they compromise his body's ability to effectively defend against COVID-19, which has spread at a far higher rate in correctional facilities than in the general population. *See* § 1B1.13 at Application Note 1(A)(ii). Mr. Garcia has carried his burden of demonstrating "extraordinary and compelling reasons" to warrant his compassionate release. § 3582(c)(1)(A)(i).

### III. The § 3553(a) Factors

Section 3582(c)(1)(A) also requires the Court to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) before granting a defendant compassionate release. § 3582(c)(1)(A). The Court has done so and it appreciates the parties' thoughtful arguments on this issue. Although Mr. Garcia's offense was non-violent, there is no doubt that it was serious: acting in concert with his codefendants, he attempted to sell a large quantity of a drug—methamphetamine—that is far too

prevalent in our community and that has ravaged countless lives. To see the destructive effects that methamphetamine addiction can have on someone's life and health, Mr. Garcia need look no further than at himself. The Court also recognizes that releasing Mr. Garcia this early into his term of imprisonment has implications for several of the § 3553(a) factors, including the need to provide general deterrence and the need to impose just punishment. *See* §§ 3553(a)(2)(A) and (B).

These factors cut both ways, however. The need to impose just punishment also demands that the Court not allow Mr. Garcia's term of imprisonment to become a sentence of death. Requiring someone with Mr. Garcia's medical conditions to remain in prison despite the grave and undeniable risks that COVID-19 poses to his health would also arguably undermine, rather than promote, respect for the law. § 3553(a)(2)(A). And to the extent Mr. Garcia's early release could create a sentencing disparity, that disparity would not be "unwarranted" because it would be driven not by arbitrary chance but by the well-considered need to protect Mr. Garcia given his unique medical vulnerabilities to COVID-19. § 3553(a)(6). Granting Mr. Garcia compassionate release will also promote his rehabilitation by allowing him to live with his daughter at a residence probation has recently approved [Doc.152] and begin the mental health and outpatient substance abuse treatment Judge Junell imposed as conditions of Mr. Garcia's supervised release [Doc.57 at 5]. On the whole, the § 3553(a) factors support Mr. Garcia's compassionate release.

### IV.    Danger to the Community

Finally, to the extent the Sentencing Commission's guidance in U.S.S.G. §1B1.13 is still applicable, it requires a court considering compassionate release to find that the defendant is "not a danger to the safety of any other person or to the community." §1B1.13(2). The Court finds that Mr. Garcia does not pose a danger to the community. While Mr. Garcia was in Criminal History Category III at the time of his sentencing in this case, many of his convictions occurred over 10

years ago and a number appear to be related to his longstanding issues with drug addiction. Doc. 30 at 9–13. Mr. Garcia is now 45 years old and the Court is hopeful that if he complies with his mandatory substance abuse treatment he can obtain his sobriety for good and remain offense-free. And while Mr. Garcia's PSR contains troubling allegations of domestic violence from the past, many of these allegations are also over 10 years old and Mr. Garcia will be required to attend anger management classes as a condition of his supervised release. Doc. 57 at 5. The Court is optimistic that after spending the past three and a half years in custody and facing what was originally an 11-year federal prison sentence, Mr. Garcia now realizes the precariousness of his situation and that this may well be his last chance to demonstrate that he can be a productive and law-abiding member of society.

However, to ensure that Mr. Garcia's release will not pose a threat to the community, the Court will order that he complete six months of home detention at his approved residence, which he will only be permitted to leave for medical appointments, mental health counseling, substance abuse treatment, and any other programs he is required to attend as part of his supervised release. And in the event Mr. Garcia violates his conditions of release, the Court ultimately retains the power to send him back to prison. *See* 18 U.S.C. § 3583(e)(3).

## CONCLUSION

For the reasons set forth above, Mr. Garcia's Motion to Reduce Sentence Under the Compassionate Release Statute 18 U.S.C. § 3582(c)(1)(A)(i) [Doc.144] is hereby **GRANTED**. Exercising its authority under 18 U.S.C. § 3582(c)(1)(A)(i), the Court will reduce Mr. Garcia's term of imprisonment to time served to protect him from the significant risk COVID-19 poses to his health while in federal custody and so that he can being serving his five-year term of supervised

release, on home detention for the first six months, at his daughter's home. An amended judgment reflecting Mr. Garcia's modified sentence will be forthcoming.

DATED this 26th day of January, 2021.

_____
The Honorable MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE